# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

PHYSICIANS DIALYSIS VENTURES, INC. :
and PHYSICIANS DIALYSIS, INC., :  Civil Action No. 06-2468 (MLC)
           :
 Plaintiffs,     :
           :
 v.        :
           :
WILLIAM H. GRIFFITH, M.D., :
           :
 Defendant.    :
           :  MEMORANDUM OPINION
_____ :
           :
WILLIAM H. GRIFFITH, M.D., :
           :
 Third-Party Plaintiff, :
           :
 v.        :
           :
DaVITA, INC.,     :
           :
 Third-Party Defendant. :
           :
_____:

**HUGHES, U.S.M.J.**

   This matter having come before the Court by Plaintiffs Physician's Dialysis Ventures Inc. and Physicians Dialysis, Inc. ("Plaintiffs") for Motions in Limine to exclude the trial testimony of Defense Experts Hannah S. Attermann and Margaret Saavedra [Dkt. entry nos. 38 and 40], both returnable September 24, 2007.  Defendant William H. Griffith, M.D. ("Defendant") filed opposition to the Motions on September 10, 2007 [Dkt. entry nos. 44 and 47].  Plaintiffs filed their reply brief on September 20, 2007 (Dkt. entry nos. 51 and 56].  Plaintiffs also seek to have

Ms. Attermann's testimony struck because of spoliation.  The Court considered the matter pursuant to Federal Rule of Civil Procedure 78.

For the reasons stated herein, Plaintiffs' motions to exclude the trial testimony of Hannah S. Attermann and Margaret S. Saavedra are denied.  Similarly, Plaintiffs' motion to preclude Ms. Attermann's testimony because of spoliation is denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs have sought this deficiency action to recover amounts due on a guaranty of a loan following foreclosure on the assets of the borrower, Physicians Dialysis of Newark, LLC ("PDN").  PDN was a joint venture between Defendant and PDVI (then Shining Star) that used funds to build and operate the Newark Dialysis Center in Newark, New Jersey (the "Dialysis Center").  Defendant has counter-claimed against Plaintiffs and Third-Party Defendants alleging a (1) breach of the PDN operating agreement by PDVI and Shining Star, (2) mismanagement of the Dialysis Center by PDI, and (3) intentional interference with the PDN operating agreement by DaVita.

### A.    PROCEDURAL BACKGROUND

On May 5, 2006 Plaintiffs filed a Complaint against Defendant in federal court. (Dkt. entry no. 1.)  On July 11, 2006 Defendant Answered Complaint and filed a Third-Party Complaint against DaVita and a counterclaim against Plaintiffs.  (Dkt. entry no. 4.)  On August 28, 2006 DaVita and Plaintiffs Answered the Third-Party Complaint and Counterclaims.  (Dkt. entry no. 8.)  On April 10, 2007, Plaintiffs filed an Amended Complaint against Defendant, (dkt. entry no. 18), and Defendant Answered the Amended Complaint on April 16, 2007. (Dkt. entry no. 22.)  Defendant also filed a Third-Party Complaint against Shining Star and DaVita as well as

another counter-claim against Plaintiffs.  *Id.*  On May 16, 2007, Plaintiffs Answered the

Counterclaim, the Amended Counterclaims, and the Amended Third-Party Complaint.  (Dkt.

entry no. 23.)  Then, on July 28, 2007, Plaintiffs filed a motion for Summary Judgment (Dkt.

entry no. 30), which was denied without prejudice on August 9, 2007 (Dkt. entry no. 40.)

Plaintiffs have filed these motions in limine to preclude Ms. Attermann's and Ms.

Saavedra's expert reports and deposition testimony on August 9, 2007. (Dkt. entries nos. 38, 40.)

Defendant opposed the motions on August 14, 2007. (Dkt. entry nos. 44, 47.)  Plaintiffs replied

to Defendant's opposition on September 20, 2007 [Dkt. entry nos. 51 and 56].

B.    Factual Background

Over the course of litigation, Defendant identified both Hannah Attermann and Margaret

Saavedra as testifying expert witnesses.  (Pl.s' Mem. at 2.)  Ms. Attermann will opine on (1) the

financial effect of the alleged mismanagement on the value of the Dialysis Center and (2)

comment and critique the Duff and Phelps Report, which is a valuation of the Dialysis Center

that was used to establish the amount of the deficiency.  *Id.*

Ms. Saavedra was retained as an expert for Dr. Griffith and is prepared to testify that the

Dialysis Center could have increased its revenue by thirty-three percent (33%). (Pl.s' Saavedra

Mem. at 2.) She will also opine regarding the deficiencies cited in a report of the New Jersey

Department of Health regarding the Dialysis Center.  *Id.*

i.    Hannah S. Attermann

Ms. Attermann has been a Certified Public Accountant since 1979 and employed by

RosenfarbWinters, LLC ("RosenfarbWinters"), one of the largest forensic accounting firms in

3

the New York metropolitan area, since March 1998.[1]  (Def.'s Opp. Br. at 5.)  Ms. Attermann also

has written an article that was published by CPA Magazine entitled "*Litigation Support 101 –*

*Introduction to Lost Profit Calculations*".  *Id.* at 8.  Moreover, Ms. Attermann is an accredited

business appraiser and has been actively involved in the preparation of business valuations for

more than seven years.  *Id.* at 11.  She successfully completed the business valuation course

offered by both the American Society of Appraisers and National Association of Certified

Valuation Analysts.  *Id.*  She is designated a Certified Valuation Analyst from the National

Association of Certified Valuation Analysts.  *Id.*  She is also an Accredited in Business Valuation

(ABV) credential from the American Institute of Certified Public Accountants.  *Id.* at 6.

Since the 1970s, Ms. Attermann has worked for accounting firms and private businesses,

including Arthur Anderson and Coopers Lybrand (the predecessor to PricewaterhouseCoopers

LLP).  *Id.* at 5.  Currently, at RosenfarbWinter, Ms. Attermann is a Senior Manager in the

Business Litigation Group.  *Id.*  She regularly gives her expert opinion regarding a "variety of

litigation matters, including shareholder disputes, commercial and contractual disputes, business

interruption claims, and professional malpractice claims, with a *specialized expertise in the*

*valuation of business damages and the valuation of businesses*."  *Id.* (emphasis added).  She has

formulated expert opinions on at least sixty (60) prior engagements and been a signatory to at

least thirty (30) expert reports, seventeen of which were business valuations.  *Id.*  Moreover, she

has been actively involved in the preparation of business appraisals for over seven years.  *Id.* at 6.

---

[1] Rosenfarb Winters provides business valuations and consulting services primarily to
lawyers who have retained their firm to assist them in their representation of clients involved in
business disputes.  *Id.*

4

Through Ms. Attermann's training and experience, she is accustomed to appraisal theory and techniques. *Id.* at 7. She has appraised a distributor, manufacturer, professional practice, physician practice, out-patient surgical center, service provider, car dealership, restaurant, photofinisher, specialized metallurgical manufacturer, foreign sales corporation, and minority interest of a family limited partnership. *Id.* Specifically, she has developed particular experience in the appraisal of business damages, both in the form of lost profits and lost business value. *Id.* at 8. The skills, concepts, and methodologies that are employed in the valuation of businesses are similar to those used in the calculation of business damages. *Id.*

With specific regard to this litigation, Ms. Attermann's Report (the "Attermann Report") was served on Plaintiff's counsel on June 8, 2007. (Pl.s' Mem. at 2.) In this report, Ms. Attermann conducted a "hypothetical" valuation of the Dialysis Center in order to calculate damages allegedly due to Defendant had the Dialysis Center not been allegedly mismanaged. *Id.* at 2, 7. Plaintiffs alleged that Ms. Attermann had only "low level, menial experience in performing the type of valuation that she presented in this matter." *Id.* Moreover, Ms. Attermann stated that "this is the first time that she has valued a dialysis center and that she did not consider herself to be an expert on valuing a dialysis center," *Id.* She does, however, consider herself an expert on business valuations. (Def.'s Opp. Br. at 15.)

In addition, Ms. Attermann critiqued the Duff and Phelps Report, which appraised the value of the Dialysis Center shortly before the foreclosure sale of the Dialysis Center to establish the Fair Market Value of the Dialysis Center for regulatory purposes. *Id.* at 3.

Plaintiffs further allege spoliation on the part of Ms. Attermann. Specifically, Plaintiffs argue that Ms. Attermann's opinions should be stricken as a sanction for her "blatant and willful

5

destruction of discoverable documents." (Pl.s' Mem. at 4.)  Plaintiffs allege that Ms. Attermann

admitted to destroying notes that she took over the course of her investigation.  *Id.*  As such,

Plaintiffs contend that, even though they have had three different opportunities to depose Ms.

Attermann, they will be prejudiced because there they have not had a full and fair opportunity to

explore the basis for Ms. Attermann's underlying opinions.  *Id.*

On the other hand, Defendant contends that Ms. Attermann had no reason to believe that

she would be obligated to produce her notes taken during her meetings with the Defendant and

defense counsel.  Ms. Attermann was never on notice that Plaintiffs were interested in her notes

since they never requested as much.  (Def.'s Opp. Br. at 24.)  In fact, Defendants argue that

Plaintiffs did not ask for Ms. Attermann's notes until eleven days after she had served them her

report.  *Id.*  Moreover, Defendant argues that Ms. Attermann destroyed the notes pursuant to her

firm's policy.  *Id.*

ii.     Margaret Saavedra

Ms. Saavedra received a bachelor of Science and Nursing degree from Pace University.

(Def.'s Saavedra Opp Br. at 6.)  She is currently a candidate for a degree in Masters of Public

Administration from Fairleigh Dickinson University and expects to receive her degree in

December 2007.  *Id.*  She has been the Dialysis Administrator at the Newark Beth Israel Medical

Center since 1986. *Id.* at 5.  She is also a licensed registered nurse in New Jersey.  Her jobs have

included management and administration of a twenty-seven (27) hospital dialysis program.  *Id.*

She has been responsible for a staff of approximately 120 multi-disciplinary personnel and has

overseen an annual budget of eight million dollars.  *Id.*  Her responsibilities include financial and

statistical analysis as well as budget management, cost reporting, contract negotiations on behalf

of Newark Beth Israel, personnel and salary administrator, preparation of grant proposals for the hospital, and management oversight.  *Id.* at 6.  Furthermore, she is responsible for the development and revision of departmental policies and procedures for the Renal Department of Newark Beth Israel, Saint Barnabas Medical Center in Livingston, and other Saint Barnabas Health Care System facilities.  *Id.*

In her expert report, Ms. Saavedra discussed her rationale for increasing treatments to a six day schedule, to add earlier shifts, and to increase utilization.  *Id.* at 8.  Specifically, she believed that if the Dialysis Center opened two shifts each on Tuesday, Thursday, and Saturday as opposed to one addition shift on Monday, Wednesday, and Friday then it would have been more profitable.[2]  (Pl.s' Saavedra Mem. at 2.)   She has engaged in this decision-making process at Newark Beth Israel, Saint Barnabas Health Care System, Jersey City Dialysis Center, the Hospital Center in Passaic, and as an outside consultant for Christ Hospital.  (Def.'s Saavedra Opp. Br. at 6.)  She assisted those facilities in determining whether to open treatment programs and facilities.  *Id.*

In offering her expert opinion, Ms. Saavedra considered the first two shifts more popular than the third or fourth shift in the Newark area.  *Id.*  She expressed this opinion because dialysis patients in the Newark area have continued to express a preference to be treated during earlier shifts.  *Id.*  They are concerned about traveling to and from dialysis during darker hours when it is less safe.  *Id.*  Further, the decision to increase days of operations and shifts also involved a

---

[2] The Dialysis Center was open to patients for two shifts for three to four hours on Monday, Wednesday, and Friday.  (Pl.s' Saavedra Mem. at 2.)  Dialysis patients with end stage renal failure, who are the types of patients served by the Dialysis Center, require three treatments per week and are usually scheduled to have treatments every other day.  *Id.*

7

consideration of the recommendations of the treating physician.  *Id.*

In reaching her conclusions about the Dialysis Center, Defendant contends that Ms. Saavedra reviewed census data from PDN, Trans-Atlantic Renal Council data ("TARC") about New Jersey dialysis needs, Beth Israel Medical Center reports, and "other documents".  *Id.*  She also relied upon her twenty-plus years of experience in dialysis treatment and administration.  *Id.*  Although she tried to conduct a cost-benefit analysis, she could not and relied on her experience that any additional operational costs in running the shifts would be "captured by the profitable revenue returns" instead.  *Id.*  On the other hand, Plaintiffs contend that Ms. Saavedra did nothing more than rely on her own subjective beliefs. (Pl.s' Saavedra Mem. at 9.)  Plaintiffs argued that "one would expect that Ms. Saavedra would have examined the cost structure of the Dialysis Center or maybe examined the staffing patterns of the Dialysis Center." (Pl.s' Saavedra Reply Mem. at 4.)  Further, Plaintiffs argued that Ms. Saavedra should know "something about the cost of opening a Dialysis Center for an additional three days a week," but Ms. Saavedra's opinions do not reflect that she factored any of this in to her opinion."  *Id.*

In addition, Ms. Saavedra offered her opinion regarding PDI's responsibility for the Dialysis Center's failure of its initial State inspection.  *Id.* at 16.  The failure of the State inspection caused a delayed opening which in turn caused a loss in revenues and patient treatment.  *Id.*  Plaintiffs allege that Ms. Saavedra neither conducted any investigation of the Dialysis Center nor reviewed any laws or regulations.[3] (Pl.s' Saavedra Mem. at 9.)  Moreover,

_____

[3] N.J. Admin. Code § 8:43A-7.3 (2007) states that a Medical Director shall be responsible for the direction, provision, and quality of medical services provided to patients, including, but not limited to developing written policies, procedures, and guidelines; planning and budgeting; coordinating and integrating care to provide a continuum of patient care; ensuring medical staff patterns are integrated; assisting in developing and maintaining written job descriptions,

Plaintiffs argued that Ms. Saavedra, who only has experience in recurring inspections, lacked the relevant experience in preparing a dialysis facility to pass an initial inspection."  (Pl.s' Saavedra Reply Mem. at 7.)

Plaintiffs also allege that Ms. Saavedra contradicts her own testimony when she stated that the Medical Director was directly responsible for some of the deficiencies noted by the State of the Dialysis Center and then later stated that "PDI was responsible for the facility's failure of its initial inspection in December 2002."  *Id.* at 9.  Further, Plaintiffs argue that Ms. Saavedra "failed to address a Medical Director's qualifications . . . an omission that speaks volumes about her own qualifications as an expert and the reliability of her opinions . . ."  *Id.* at 9-10.  Plaintiffs also point out that she fails to acknowledge that Dr. Griffith, as a member of the Board of Managers, was a member of the management team.  *Id.* at 11.

## II.   DISCUSSION

### A.     FEDERAL RULE OF EVIDENCE 702

Pursuant to Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In 2000, the Supreme Court provided guidance to the federal district courts applying

---

reviewing credentials, and assigning duties; participating in staff orientation and education; and approving adequacy and compliance in connection with emergency kits, carts, and related equipment.

Federal Rule of Evidence 702.  The Court stated that "district courts serve as the gatekeepers and must determine the reliability of the proffered testimony."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (2000).  The objective of the district court's gatekeeping role "is to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Daubert*, the Supreme Court set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony.  509 U.S. 579.  These factors include (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 590-92; *see also Simmons v. Ford Motor Co.*, 132 Fed. Appx. 950, 952 (3d Cir. 2005).  At a minimum, "[a]n expert opinion is reliable when it is based on sound methodology and 'good grounds'."  *Kumho*, 526 U.S. 137; *D&D Associates v. Bd. of Educ. of N. Plainfield*, No. 03-1026 (MLC), 2006 U.S. Dist. LEXIS 16721, at *10-11 (D.N.J. Mar. 20, 2006).

In *Kumho*, the Supreme Court addressed the applicability of the *Daubert* standards

10

beyond "scientific" expert testimony.  The Court stated that in non-scientific cases, the *Daubert*

factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue,

the expert's expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150.  The Court

further stated that "the relevant reliability concerns may focus upon personal knowledge or

experience." *Id.*, *see also United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007)(the Third

Circuit reiterated that reliability may turn on the proposed expert's "personal knowledge or

experience").  For witnesses relying solely or primarily on experience, then the witness must

explain how that experience leads to the conclusion reached, why that experience is a sufficient

basis for an opinion, and how that experience is reliably applied to the facts.  *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995).  Furthermore, the court must

still determine whether there are "good grounds" for the proffered opinion.  *See Poust v.*

*Huntleigh Healthcare*, 998 F. Supp. 478 (D.N.J. 1998).  Moreover, an expert may be allowed to

testify about an area in which he does not have extensive training; specifically, when the expert

has experience employing the same principles at issue, he is entitled to a "liberal standard"under

Federal Rule of Evidence 702.  *See Tormenia v. First Investors Realty Co., Inc.*, 251 F.3d 128

(3d Cir. 2000).

        In addition to offering reliable expert testimony, the trial court must also determine

whether the expert has adequate "specialized knowledge" such that he is qualified to testify as an

expert.  The basis of "specialized knowledge" can be from "practical experience as well as

academic training and credentials." *Kane Builders, Inc. v. Southern New Jersey Building*

*Laborers Dist. Council*, 2007 WL 2416470, at *6 (D.N.J. 2007) (quoting *Waldorf v. Shuta*, 142

F.3d 601, 625 (3d Cir. 1998)).  The Third Circuit has interpreted the "specialized knowledge"

requirement liberally, finding that "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

"The permissible scope of expert testimony is quite broad, and district courts are vested broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H. Rostock*, 435 F.3d 404, 423 (3d Cir. 2006).  It is important to note that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152.  With that said, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, *2000 Amendments*. "*Daubert* did not work as a 'seachange over federal evidence law', and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1995). Put another way, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

The standard of review for a district court's decision to admit or exclude scientific evidence is abuse of discretion.  *General Electric v. Joiner*, 522 U.S. 136, 146 (1997).  A district court specifically abuses its discretion when "it excludes testimony simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers the most appropriate." *Lauria v. Natl. R.R. Passenger Corp.*, 145 F.3d 593, 598-99 (3d Cir. 1998)(citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)(citing *In re Paoli*, 916 F.2d 829, 856)).

B.    EXPERT TESTIMONY OF MARGARET SAAVEDRA

Ms. Saavedra is a qualified expert under Federal Rule of Evidence 702.  Plaintiffs argue that Ms. Saavedra's opinions are not sufficiently reliable to be admissible in to evidence since she has no "testable data to back up her opinion."  (Pl.s' Saavedra Mem. at 5.)  Plaintiffs further allege that Ms. Saavedra's opinion regarding the duties and responsibilities of management are also not sufficiently reliable since she "failed to identify anything that would lead this Court to conclude that her opinion. . . is reliable in any way."  *Id.* at 9.

Contrarily, Defendant argues that Ms. Saavedra's opinion regarding days and shifts of operations are sufficiently reliable based upon her vast experience.  (Def.'s Saavedra Opp. Br. at 13.)  Further, Defendant also argues that Ms. Saavedra's opinions regarding PDN's failure of the New Jersey Inspection and Plaintiffs' role in that failure are sufficiently reliable to be admitted into evidence because of her training and experience.  *Id.* at 16.

Ms. Saavedra's testimony, which is based on sound methodology and "good grounds", is admissible pursuant to Federal Rule of Evidence 702 and its progeny.

     i.    Qualifications

Ms. Saavedra has specialized knowledge to testify as an expert because she has been the Dialysis Administrator at the Newark Beth Israel Medical Center for twenty-one (21) years.  *Id.* at 5.  Her job responsibilities have included both management and administration of twenty-seven (27) hospital dialysis programs in addition to the Inter-hospital Hemodialysis Outreach Program.  *Id.*  She has been responsible for a staff of approximately 120 multi-disciplinary personnel and has overseen an annual budget of eight (8) million dollars.  *Id.*  Further, she has overseen an eighteen (18) station hospital based at Saint Barnabas Medical Center in Livingston,

a twenty (20) station program at Saint Barnabas Ambulatory Care Center, a sixteen (16) station program at the Union Saint Barnabas Ambulatory Care Center, the Acute Case Program at Clara Maass Medical Center and Contract Services at Irvington General Hospital and Union Hospital. *Id.* Moreover, her responsibilities include financial analysis and budget management, statistical analysis, cost reporting, contract negotiations on behalf of Newark Beth Israel, personnel and salary administrator, preparation of grant proposals for the hospital, and management oversight. *Id.* at 6. She is also responsible for the development and revision of departmental policies and procedures as well as assuring compliance with federal and state regulations for Newark Beth Israel and Saint Barnabas. *Id.*

Before being employed at Newark Beth Israel, Ms. Saavedra was the Director of Nursing for the Jersey City Dialysis Center from 1978-1986, a for-profit dialysis center. *Id.* She was in charge of, among other things, the development and revision of procedural manuals, participating in the annual budget preparation, and responsible for supervising clinical staff and various medical personnel. *Id.*

For the aforementioned reasons, Ms. Saavedra has the "sufficient knowledge" required to opine as an expert pursuant to Federal Rule of Evidence 702.

        ii.    <u>Methodology</u>

Ms. Saavedra's methodology is reliable. Plaintiffs argued that Ms. Saavedra has "no testable data to back up her opinion." (Pl.s' Saavedra Mem. at 5.) Plaintiffs allege that Ms. Saavedra's opinion "consists simply of declarations of the way the world is in her eyes" and that she had never been to the Dialysis Center. *Id.* at 6. Moreover, according to Plaintiffs, she neither reviewed a business plan or budgets for the facility nor conducted a cost-benefit analysis. *Id.*

14

Plaintiffs contend that Ms. Saavedra did nothing more than rely on her own subjective beliefs. *Id.* at 9.  Plaintiffs argued that "one would expect that Ms. Saavedra would have examined the cost structure of the Dialysis Center or maybe examined the staffing patterns of the Dialysis Center." (Pl.s' Saavedra Reply Mem. at 4.)  Further, Plaintiffs argued that Ms. Saavedra should know "something about the cost of opening a Dialysis Center for an additional three days a week," but Ms. Saavedra's opinions do not reflect that she factored any of this in to her opinion." *Id.*  In sum, Plaintiffs argued that the "if you build it, they will come" methodology employed by Ms. Saavedra is not reliable.  (Pl.s' Saavedra Mem. at 7.)  Rather, the Court finds that Ms. Saavedra, through her vast experience in dialysis centers and reliable methodology, is qualified as an expert pursuant to Federal Rule of Evidence 702.

Specifically, Ms. Saavedra's methodology is built around her twenty plus years of experience as a nurse and a Dialysis Administrator which led her to conclude that the Dialysis Center should have opened shifts on Tuesday, Thursday, and Saturday.  She has engaged in decision-making, such as whether to increase operations, through her experience at Newark Beth Israel, Saint Barnabas, and Jersey City Dialysis Center. (Def.'s Saavedra Opp. Br. at 8.)  She has also relied on her vast experience working with patients and transferring patients.  She further relied upon the recommendations of the treating physician.  *Id.*

In addition to her experience, she reviewed census data from PDN, Trans-Atlantic Renal Council data, and insight about overall New Jersey dialysis needs, and Beth Israel reports.  *Id.* She contacted Trans-Atlantic Renal Council in an attempt to obtain surveys regarding the preference of patient shifts but was unsuccessful.  *Id.* at 9.  She did, however, state that it was "commonly known in the nephrology community. . . that patients prefer the earlier shifts during

the day because the later shifts are less safe times and patients want to avoid traveling for treatment during the later hours of the day." *Id.* Moreover, she relied upon her experience in handling budgets, salary, and other management duties to conclude that any additional cost in opening the additional days would be captured by the profitable revenue returns. *Id.*

Thus, Ms. Saavedra's opinions are not subjective and conclusory, but rather are based upon her lengthy experience working with patients and hospital administration. Her methodology is reliable because she explained how her experience is a sufficient basis for her opinions, how her experience led her to the conclusion reached, and how her experience is reliably applied to these facts.

Similarly, her opinions regarding the duties and responsibilities of management are also reliable. Ms. Saavedra considered regulations, policies, procedures, and her experience on who at a dialysis center prepares for and responds to an inspection by government entities and agencies. *Id.* at 9. Plaintiffs state that "no amount of experience can replace a review of regulations when tasked with performing a detailed review of the duties and obligations of regulated parties." (Pl.s' Saavedra Mem. at 10.) Plaintiffs also allege that Ms. Saavedra contradicts her own testimony when she stated that the Medical Director was directly responsible for some of the deficiencies noted by the State of the Dialysis Center and then later stated that "PDI was responsible for the facility's failure of its initial inspection in December 2002." (Pl.s' Saavedra Reply Mem. at 9.) Further, Plaintiffs argue that Ms. Saavedra "failed to address a Medical Director's qualifications . . . an omission that speaks volumes about her own qualifications as an expert and the reliability of her opinions . . ." *Id.* at 9-10. Plaintiffs also point out that she fails to acknowledge that Dr. Griffith, as a member of the Board of Managers,

was a member of the management team.  *Id.* at 11.

We disagree with Plaintiffs because Ms. Saavedra testified that she is "familiar with the New Jersey regulations" and "the state surveyor that was at the clinic in the December survey." (Pl.s' Saavedra Mem. at 10.)  Familiarity with the laws and regulations in conjunction with her experience is enough for her to formulate a expert opinion pursuant to Rule 702.

Furthermore, Plaintiffs' arguments focus on the *weight* of the expert witnesses testimony as opposed to its *admissibility* (emphasis supplied).  From an admissibility perspective, Ms. Saavedra's testimony satisfies the requirements required by Rule 702 and its progeny.  Although Ms. Saavedra may not be the "best qualified", "most reliable", or the "most appropriate" expert witness, the Court's role as a gatekeeper is not intended to replace the adversarial system, which is the cornerstone of American jurisprudence.  Surely, Ms. Saavedra will be subjected to vigorous cross-examination in addition to the presentation of any existing contrary evidence.

iii.   Assist the Trier of Fact

Ms. Saavedra's testimony will assist the trier of fact.  As Plaintiffs point out, "[a] central point of contention is whether the Dialysis Center could have been made more profitable by openings its doors to two additional patient shifts of Tuesday, Thursday, and Saturday, rather than one additional shift on Monday, Wednesday, and Friday, at a time when the Dialysis Center did not have enough patients to completely fill even one additional shift and patient growth had been stagnant for the prior year."  (Pl.s' Saavedra Mem. at 2.)  Thus, Ms. Saavedra's testimony that the Dialysis Center should have opened these additional shifts would clearly assist the trier of fact.  Moreover, her opinion as to the duties and responsibilities of management would assist the trier of fact because her opinions, which are based on her extensive experience, will help shed

17

light on what is also a central point in contention.

Therefore, Plaintiffs' motion in limine to exclude the expert report and deposition testimony of Ms. Saavedra is denied.

C.　Expert Testimony of Hannah S. Attermann

Ms. Attermann is a qualified expert whose reliable testimony will assist the trier of fact. Plaintiffs argue that she is not a qualified expert and that, even if she were, her methodology is unreliable since she did not follow the industry established methodology for the valuation or appraisal review.  On the other hand, Defendant argues that she is a qualified expert whose methodology is reliable and does follow the industry standards.

i.　Qualifications

Ms. Attermann is a qualified expert pursuant to Federal Rule of Evidence 702.  Plaintiffs argue that she is not qualified as an expert pursuant to Rule 702 and, even if she was, her methodologies are unreliable.

Specifically, Plaintiffs argue that Ms. Attermann does not have the requisite experience to qualify as an expert.  (Pl.s' Mem. at 6.)  Plaintiffs highlight the fact that Ms. Attermann has "never submitted an expert report in connection with a litigation." *Id.*; Sull. Decl. Ex. 1 at 62:20-24.  They further allege that Ms. Attermann has never before done a hypothetical valuation or conducted a valuation of a dialysis center.  *Id.*  Moreover, Plaintiffs argue that Ms. Attermann has "only done work at the level appropriate for an entry-level employee" and has performed "probably two" appraisal reviews before this one.  *Id.*  Further, Plaintiffs argue that she has "never before done a valuation of a market management fee of a dialysis center." *Id.*  The Plaintiffs further argue that Ms. Attermann herself admits that she is "**not a dialysis center**

**expert**." *Id.* at 7; Sull. Decl. 81:20-25 (emphasis in original).  In sum, Plaintiffs contend that

when the "several layers of puffery" are removed, Ms. Attermann has only been involved in two

reports.  (Pl.s' Reply Mem. at 7.)

    Although courts are not reluctant to disqualify an otherwise educated expert when that

expert purports to testify in an area in which he or she does not have the requisite experience,

Ms. Attermann does have extensive experience in valuating businesses and conducting

appraisals.[4]  Specifically, Ms. Attermann, who holds a CPA, is a Senior Manager in the business

litigation group of Rosenfarb Winters, which is an established forensic accounting firm. (Def.'s

Opp. Br. at 11.)  She has assisted attorneys with expert reports concerning lost profits and other

economic damages and accounting malpractice.  *Id.*  She has formulated expert opinions on at

least sixty (60) engagements and signed seventeen (17) business valuation reports.  *Id.*  She has

made significant contributions to business valuation reports where she did not serve as the

signatory.  *Id.*  She has been designated lead engagement professional or as a testifying expert on

at least twelve (12) occasions.  *Id.*  Moreover, Ms. Attermann is an accredited business appraiser

who has been actively involved in the preparation for business valuations for more than seven

years.  *Id.*  She is a Certified Valuation Analyst as designated by the National Association of

Certified Valuation Analysts.[5]  *Id.*

---

    [4] *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997) (affirming the
district court's disqualification of an engineer who did not have the requisite experience to
support his proffered theory); *Aloe Coal Co. and Commercial Union Ins. Co. v. Clark Equip.
Co.*, 816 F.2d 110, 114-15 (3d Cir. 1987) (finding that the district court abused its discretion by
allowing an experienced salesman to testify about the cause of an equipment fire).

    [5] Plaintiffs contend that this information provided by Defendant is "replete with
speculative and unreliable statements" that are "baseless and unconfirmed." (*See* Pl.s' Reply
Mem. at 6.)

Although Ms. Attermann stated that she is not a "dialysis center expert", she is indeed an "expert on the valuation of businesses".  *Id.* at 15; *(see also* Pl.s' Mem. at 7.)  As previously noted, it would be an abuse of discretion for the Court to disqualify an expert simply because we did not find that the expert was "the best qualified" or the "most appropriate".  Here, Ms. Attermann holds a CPA and multiple valuation certificates from multiple organizations.  Simply put, Ms. Attermann is an experienced certified accountant and business appraiser who qualifies as an expert pursuant to Rule 702.

ii.    Methodology

Plaintiffs allege that although Ms. Attermann stated that she conducted her report and review of the *Duff and Phelps Report* in accordance with the standards of business valuations promulgated by the Uniform Standards of Professional Appraisal Practice ("USPAP"), she actually violated several provisions of USPAP.  Specifically, Plaintiffs allege that Ms. Attermann violated Rule 3-1(c) of USPAP, which requires that an appraisal review "be conducted in the market conditions as of the effective date of the opinion in the work being reviewed."  The comments to Rule 3-1(c) state that "[t]he reviewer may use information available to him or her that was not available to the original appraiser in the development of his or her own value opinion.  However, the reviewer may not use such information as the basis to discredit the original appraiser's opinion of value."  (Sull. Decl., Ex. 5.)  The *Duff and Phelps Report* was created to report the fair market value of the equity of the Dialysis Center as of September 19, 2005 and written on February 7, 2006.  Thus, according to Plaintiffs, Ms. Attermann could not use information only knowable after February 7, 2006 to critique the *Duff and Phelps Report*.  (Pl.s' Mem. at 9.) Plaintiffs allege that Ms. Attermann based her critique – that the "Duff and

Phelps . . . census growth assumption was unreasonable low" – on information knowable only after the *Duff and Phelps Report* was created.  *Id.*  As such, Plaintiffs argue that her report violates the USPAP and is thus unreliable.  We disagree.

Ms. Attermann's testimony is that the *Duff and Phelps Report* incorporated the DaVita assumptions exactly into their valuation of PDN whilst not considering Dr. Griffith's census assumptions. (Def.'s Opp. Br. at 18.)  Dr. Griffith's census assumptions, which *Duff and Phelps* knew at the time, were significantly higher than DaVita's assumptions.  *Id.*  Ms. Attermann, therefore, is not relying on information that was unknowable to *Duff and Phelps*; rather, Ms. Attermann's opinion criticized *Duff and Phelps* for failure to use reasonable and rational assumptions in its valuation calculations instead of relying on the biased assumptions provided by DaVita.  *Id.*[6]  Put another way, Ms. Attermann opined that *Duff and Phelps* should have incorporated Dr. Griffith's valuation assumptions and failure to do so was, in her opinion, a critical error.  Moreover, to the extent that Ms. Attermann opined that two additional dialysis centers were opened in the area, the Court finds that these are subordinate statements that do not render her methodologies and opinions unreliable.[7]  In fact, the *Duff and Phelps Report* is less relevant since Mr. Boettiger put forward an opinion of values as of April 12, 2006, which was the time of the foreclosure sale.  In any case, her opinion that two additional dialysis centers opened does not render her expert opinion unreliable.

Once again, Plaintiffs rely upon the weight of Ms. Attermann's testimony as opposed to

---

[6] *See In re Nellson Nutraceutical*, 2007 WL 201134, at *1 (Bankr. Del. 2007) which discusses an appraiser's forecasts in light of conflicting, informed opinions.

[7] We note, however, that two dialysis centers opening in 2006 could not have been knowable for an appraisal in 2005.

its admissibility.  Pursuant to the Federal Rules, Ms. Attermann's testimony is indeed admissible;

however, its weight is subject to debate that will ultimately be determined by the trier of fact.

iii.   <u>Assist the Trier of Fact</u>

Ms. Attermann's testimony assists the trier of fact.  Ms. Attermann's valuation of the

Dialysis Center and her critique of the *Duff and Phelps* has a direct bearing on the critical issue

surrounding this case: whether the Dialysis Center was undervalued.  Accordingly, her testimony

will assist the trier of fact in reaching a just verdict at trial.

Therefore, for the above mentioned reasons, Plaintiffs' motion to preclude the expert

report and deposition testimony of Hannah S. Attermann is denied.

D.    <u><small>SPOLIATION</small></u>

Ms. Attermann did not engage in spoliation.  In order for spoliation inference to apply,

four essential factors must be satisfied.  First, "it is essential that the evidence in question be

within the party's control." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d

Cir. 1995).  Second, "it must appear that there has been actual suppression or withholding of the

evidence." *Id.*  Third, the evidence destroyed or withheld was relevant to claims and defenses.

*Scott v. IBM Corp.*, 196 F.R.D. 233, 248 (D.N.J. 2000); *Veloso v. Western Bedding Supply Co.*,

281 F. Supp.2d 743, 746 (D.N.J. 2003).  And fourth, it was reasonably foreseeable that the

evidence would later become discoverable.  *Scott*, 196 F.R.D. at 248; *Veloso*, 281 F.Supp.2d at

746.  In addition, three considerations dictate whether drastic sanctions such as dismissal or

suppression of the evidence are warranted: (1) the degree of fault of the party who altered or

destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3)

whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and,

22

where the offending party is seriously at fault, will serve to deter such conduct by others in the future. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Practically speaking, "the key is that an expert must produce what was given to him, but he is not required to retain every scrap of paper that he created in the course of this preparation . . ." *Fidelity Nat'l Title Ins. v. Intercounty Nat'l Title Ins.*, 412 F.3d 745, 751 (7th Cir. 2005).

Here, Ms. Attermann had no reason to believe that she would be obligated to produce the specific notes taken during her meetings with the Defendant and defense counsel. She was not on notice that Plaintiffs wanted her notes since Plaintiffs failed to include any document requests in their request for an extension of time to complete expert discovery. (Def.'s Opp. Br. at 24.) Plaintiffs did not ask for her notes until June 19, 2007, which was eleven (11) days after Ms. Attermann served her report. *Id.* Pursuant to her firm's policy, she had already destroyed those notes. *Id.*

Moreover, there is no evidence that Plaintiffs have been prejudiced. Plaintiffs argue that "the destruction of her notes have denied DaVita Entities their rightful opportunity to explore the basis of her opinions." (Pl.s' Mem. at 12-13.) We disagree. Ms. Attermann did produce notes that were taken in collecting information from non-parties. (Def.'s Opp. Br. at 25.) The only notes that she discarded related to conversations with Defendant and his counsel, which may have been protected by the attorney-client privilege. *Id.* Furthermore, Plaintiffs had three opportunities to depose the Defendant as well as an opportunity to depose Ms. Attermann. *Id.* Plaintiffs have superior and more extensive knowledge about PDN, DaVita, PDI, and PDVI, than does the Defendant. *Id.* Thus, Plaintiffs have failed to show that they will be prejudiced to the point where sanctions would be appropriate.

Therefore, since Plaintiffs are not prejudiced and Ms. Attermann was not at fault since she did not destroy the documents maliciously, Plaintiffs' Motion for Spoliation is not in the interest of justice and is therefore denied.

## III.    CONCLUSION

For the aforementioned reasons, Plaintiffs' motions to exclude the expert reports and deposition testimonies of Margaret Saavedra and Hannah Attermann are denied.  Ms. Saavedra and Ms. Attermann are qualified experts pursuant to the Federal Rules of Evidence.  In addition, Plaintiffs' motion for spoliation is denied.  An appropriate Order accompanies this Memorandum Opinion.

**DATED: October 23, 2007**